In re PERRY H. KOPLIK & SONS, INC., Debtor.

Michael S. Fox, as Litigation Trustee of Perry H. Koplik & Sons, Inc., Plaintiff,

v.

Bank Mandiri, formerly known as Bank Dagang Negara, Defendant.

Bankruptcy No. 02–40648 (REG).
Adversary Proceeding No. 05–01136.

United States Bankruptcy Court, S.D. New York.

Oct. 23, 2006.

232

Kelley Drye & Warren LLP, by Robert S. Friedman, Esq. (argued), Alison MacGregor, Esq., New York, NY, Counsel for Plaintiff Michael S. Fox, Litigation Trustee of Perry H. Koplik & Sons, Inc.

White & Case LLP, by Carolyn B. Lamm, Esq., Francis A. Vasquez, Jr., Esq. (argued), Nicole Erb, Esq., Washington, D.C., Counsel for Defendant Bank Mandiri, formerly known as Bank Dagang Negara.

## DECISION AND ORDER ON MOTION TO DISMISS

ROBERT E. GERBER, Bankruptcy Judge.

In this adversary proceeding under the umbrella of the chapter 11 case of Perry H. Koplik & Sons, Inc. ("Koplik"), plaintiff Michael S. Fox (the "Trustee"), the Litigation Trustee for the Koplik estate, seeks money damages from defendant Bank Mandiri for Bank Mandiri's failure to honor a letter of credit. Bank Mandiri moves, pursuant to Fed.R.Civ.P. 12(b)(2) and 12(b)(6), as made applicable to this adversary proceeding under Fed. R. Bankr.P. 7012(b), to dismiss the complaint. Bank Mandiri asserts (breaking down some of its contentions into sub-points) that (1) the action is barred by reason of *res judicata,* as a consequence of legal proceedings in Indonesia; (2) comity requires respect for the proceedings in Indonesia (including proceedings that Bank Mandiri asserts ordered Bank Mandiri to suspend payment on the letter of credit), precluding consideration of the Trustee's claims here; (3)

doctrines of collateral and judicial estoppel preclude the Trustee from relitigating issues already decided or pending in Indonesia; (4) Koplik's Plan of Reorganization did not properly preserve this Court's retention of jurisdiction over the Trustee's claims; and (5) this Court lacks personal jurisdiction over Bank Mandiri, by reason of missteps by the Trustee in effecting service in the manner required under the Foreign Sovereign Immunities Act ("FSIA").

The motion is denied. Most of Bank Mandiri's defenses are deficient under the undisputed facts. The remainder raise, at best, material issues of fact. None warrants dismissal on the state of the record here.

*Facts* [1]

In March 1997, Koplik, a New York corporation in the paper milling business, entered into a contract with PT Citra Hutama Kertasindo ("Kertasindo"), an Indonesian company also in the paper milling business. Kertasindo wanted to purchase second-hand paper mill machines and equipment. The contract provided that Koplik would finance the purchase, on the condition that Kertasindo obtain a letter of credit backing up Kertasindo's payment obligations.

In January 1999, Kertasindo did so. It procured a letter of credit from Bang Dagang Negara ("BDN"), an Indonesian bank with a branch in New York; both branches are alleged to have played a role in the transaction. The Trustee alleges (and Bank Mandiri has not yet disputed, if it ever will) that following a merger, Bank Mandiri succeeded to BDN's obligations. Bank Mandiri asserts (and the Trustee has not yet disputed, if he ever will) that Bank Mandiri is 70% owned by the Republic of Indonesia, and hence is an "agency of instrumentality of a foreign state" within the meaning of Section 1603(b) of the FSIA.

The letter of credit issued by BDN (the "Letter of Credit"), which was dated January 28, 1999, was in the amount of approximately $5.3 million. Kertasindo was obligated to pay Koplik, the Letter of Credit's beneficiary, upon receipt of the paper mill machines and equipment. But the Letter of Credit required Bank Mandiri to pay Koplik in the event of a default by Kertasindo.

On March 24, 1999 and April 4, 1999, Kertasindo received the paper mill machines and equipment, but defaulted on its obligation to pay Koplik. As a result, in May 1999, Koplik attempted to collect payment from Bank Mandiri under the Letter of Credit. However, Bank Mandiri declined to honor the Letter of Credit, and did not pay Koplik.

Thereafter, Koplik filed suit (the "Koplik Suit") against Kertasindo and Bank Mandiri in the Indonesian District Court of Surabaya, seeking to recover on the $5.3 million debt. In the Koplik Suit, the Indonesian District Court of Surabaya ruled that the Letter of Credit was binding, and ordered Bank Mandiri to pay Koplik the $5.3 million. Bank Mandiri then appealed to the Indonesian High Court (an intermediate appellate court), which, on September 11, 2000, "cancelled" the District Court's decision. Koplik then appealed the High Court's decision to the Indonesian Supreme Court, Indonesia's highest court. In a decision dated May 30, 2002 (the "First Indonesia Supreme Court Decision"), the Indonesia Supreme Court reinstated the District Court's decision, enforcing the Letter of Credit.

By a procedure that is not clear to this Court, Bank Mandiri then obtained further

---

**1.** In the interests of relative brevity, the Court has omitted citations with respect to background facts, and has limited record citations to the most significant matters.

review by the Indonesia Supreme Court of the First Indonesia Supreme Court Decision. In a decision dated September 29, 2003 (the "Second Indonesia Supreme Court Decision"), the Indonesia Supreme Court vacated its earlier decision enforcing the Letter of Credit, on the stated ground that there was a defect in the power of attorney Koplik had issued to permit its Indonesia representative to sue. The power of attorney had to be acknowledged before a notary, and Koplik had done so. But the acknowledgment of the power of attorney was lacking a second level of authentication, to be issued by the Indonesian Consul in New York.[2]

The failure to provide this second level of authentication—similar or identical to what New York practitioners refer to colloquially as a "notarial flag," which would attest to the fact that the notary was, in fact, a notary—resulted in Koplik's inability to recover on a $5.3 million letter of credit that the Indonesia Supreme Court had just ruled, in the First Indonesia Supreme Court Decision, should be enforced. The determination in the Second Indonesia Supreme Court Decision had nothing whatever to do with whether the Letter of Credit had been duly issued; whether its requirements for funding had been satisfied; or whether there were other principles of law under which a bank issuer could be released from its contractual duty to pay under a letter of credit. Significantly, there is no indication, in the Second Indonesia Supreme Court Decision, that it found fault with respect to the merits of its earlier determination, or the determination of the District Court of Surabaya, that payment on the letter of credit was, indeed, due. This Court determines, as a fact or mixed question of fact and law, that the Second Indonesia Supreme Court Decision was not on the merits.

2. Koplik, as a New York corporation, was required to proceed by a representative in the Indonesian courts, by rendering a power of attorney to an individual with the authority to participate in such courts. Koplik executed a power of attorney, which was duly executed, with the proper acknowledgment required under New York law. However, the acknowledgment was insufficiently "legalized." The Indonesia Supreme Court declared, in the Second Indonesia Supreme Court Decision:

b. Whereas to be able to act before the [Indonesia] court, the legal entity should be represented by a person who has capacity to act for and on behalf of Perry H. Koplik & SonsInc. [sic.] in accordance with the applicable law of the State of New York, and such a person may render an authority to another person to represent him at the Indonesian courts by rendering a power of attorney in the form required by the law applicable in the State of New York and finally legalized with the Officer of the Indonesian Consul in that area;

c. Whereas the power of attorney dated July 28, 1999 from Alvin Siegel (Executive Vice President and Chief Operating Officer of Perry H. Koplik & Sons, Inc.) to Samuel Willendra has been legalized by the Public Notary in New York, but the signature of Alvin Siegel has not been legalized by the Indonesian Consul in New York, so it cannot be used as a legal basis for Samuel Willendra to convey the power to O.C. Kaligis, SH to commence an action in the Indonesian courts;

d. Whereas for this reason, O.C. Kaligis, SH and associates who received a special power of attorney from Samuel Willendra ... cannot not [sic.] serve as the attorney of Perry H. Koplik & Sons Inc. to commence an action, and accordingly the action instituted by O.C. Kaligis, SH and associates must be declared unacceptable;

e. Whereas by the unacceptability of the Plaintiff's claim for formal reason, the claims instituted by Defendant III in the Counterclaim must also be declared unacceptable.

Second Indonesia Supreme Court Decision at 3031. There is no indication in the record that the Indonesia courts provided any opportunity to cure the procedural defect.

There is, in addition, another litigation in Indonesia related to this controversy. A separate litigation (the "Kertasindo Suit") was initiated by Kertasindo, the principal obligor, with respect to the underlying purchase and sales contract between Koplik and Kertasindo. On July 15, 2003, the Indonesian District Court of Surabaya issued a decision (the "Kertasindo Decision") holding that the underlying sale contract was void for fraud, declaring the Letter of Credit null and void, and ordered Bank Mandiri "to suspend the payment" on the Letter of Credit "until the judgment for this case has been final, binding and enforceable...."[3] It is unclear to this Court, based on this state of the record, as to the extent to which this determination took into account earlier rulings as to the merits of the Surabaya District Court and the Indonesia Supreme Court in the First Indonesia Supreme Court Decision. In June 2004, Koplik appealed the Kertasindo Decision, and so far as the record reflects, the appeal is currently pending in the Indonesian courts.

Meanwhile (and overlapping in time, in part, events described above), Koplik became the subject of a bankruptcy case in the United States. On March 11, 2002, Koplik's creditors filed an involuntary chapter 7 case against Koplik in this Court. Shortly thereafter, pursuant to a Stipulation and Order entered in April 2002, an order for relief was entered in the involuntary case, and Koplik's chapter 7 case was converted to a case under chapter 11. In April 2003, this Court confirmed Koplik's Fifth Amended Chapter 11 Plan of Reorganization (the "Plan"), pursuant to which the Trustee was appointed.

In February 2005, the Trustee commenced this adversary proceeding against Bank Mandiri for failure to honor the Letter of Credit. The present motion followed.

### Discussion

#### I.

#### Res Judicata

Bank Mandiri asserts in its Motion to Dismiss that under principles of *res judicata,* the Second Indonesia Supreme Court Decision bars this Court from allowing Koplik's claims to proceed. This Court does not agree.

This Court's determination of potential *res judicata* overlaps, in part, with its consideration of principles of comity. If, on the one hand, the requirements for applying *res judicata* would not be satisfied even if the assertedly binding decision had been issued by a United States court, there would be no need to address comity. But if, on the other hand, a litigant sought to invoke *res judicata* based on the substantive determination of a foreign court, an American court would necessarily have to consider whether comity requires respect for the foreign decision. The Court considers these in Parts I(A) and I(B), respectively.

#### A.

■ Here, as a fact or mixed question of fact and law, this Court has determined that the Second Indonesian Supreme Court decision was not on the merits. As previously noted, the Second Indonesia Court Decision was not based on substantive analysis of the Letter of Credit itself, or of whether the Letter of Credit had been duly issued; whether its requirements for funding had been satisfied; or whether there were other substantive legal bases under which an issuer bank might be released from its contractual duty to pay under a letter of credit once its funding

---

**3.** Sardjono Decl. Ex. B at 120–21, 128.

requirements had been satisfied. Rather, Koplik was unable to assert its alleged contractual rights by reason of a classic procedural defect—the lack of a consular flag on a duly acknowledged power of attorney that without dispute had been executed.

The requirement that the judgment for which preclusion is sought be based on the merits is universal among American courts.[4] Under these circumstances, Bank Mandiri could not invoke *res judicata* based on the Second Indonesia Supreme Court Decision even if a decision of that character had been issued by an American court.[5]

### B.

The result would be the same even if Indonesian *res judicata* law were deemed to apply, and if Indonesia regarded a decision of the character of the Second Indonesia Supreme Court Decision to be on the merits. United States courts will grant comity only to foreign decisions that "[do] not violate American public policy."[6] Putting aside the issues with respect to whether *any* decision of the Indonesia courts would be worthy of comity in light of the showing of corruption in the Indonesia courts (discussed in Part II below), this Court believes that it would be contrary to American public policy to deny enforcement of a letter of credit without reaching the merits for an offense no greater than failing to secure a second authentication of a power of attorney, at least without opportunity and failure to cure.

Bank Mandiri's apparent argument that the misstep of failing to secure a second authentication on the power of attorney should be regarded as a substantive deficiency relieving it of a $5.3 million contractual obligation is offensive to this Court, and to American public policy.[7] Despite

---

4. *See, e.g., Indep. Party of Ark. v. Priest*, 907 F.Supp. 1276, 1280 (E.D.Ark.1995) (restating the rule that *res judicata* bars relitigation of a claim if the prior judgment was a final judgment on the merits); *Sclafani v. Story Book Homes, Inc.*, 294 A.D.2d 559, 743 N.Y.S.2d 283, 283 (2d Dep't 2002) ("Where a dismissal does not involve a determination on the merits, the doctrine of *res judicata* does not apply.") (citing *Maitland v. Trojan Elec. & Mach. Co.*, 65 N.Y.2d 614, 491 N.Y.S.2d 147, 480 N.E.2d 736 (1985) and *Hoey v. Kuchler*, 249 A.D.2d 365, 671 N.Y.S.2d 487 (2d Dep't 1998)); *State v. Roark*, No. 84992, 2005 WL 983042, at *2 (Oh.Ct.App. Apr. 28, 2005) (same); *A.L. Kornman Co. v. Metro. Gov't of Nashville Davidson County*, 216 Tenn. 205, 391 S.W.2d 633, 636 (1965) (same).

5. Likewise, basic *res judicata* law requires that any decision upon which it is based be a final determination. As the Kertasindo Decision is provisional and, so far as the record reflects, now the subject of an ongoing appeal, there is no basis for applying *res judicata* doctrine to that decision either.

6. *Tahan v. Hodgson*, 662 F.2d 862, 864–67 (D.C.Cir.1981) (interpreting *Hilton v. Guyot,*

159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895)). *See also In re Treco*, 240 F.3d 148, 158–161 (2d Cir.2001) (explaining the factors in Bankruptcy Code section 304 (applicable to cases filed before the effective date of the amendments contained within the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005) that a bankruptcy court must take into consideration when deciding whether to afford comity to a foreign judgment); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 117 cmt. c (1971) (stating that American courts should not grant comity to decisions that are "repugnant to fundamental notions of what is decent and just in the State where enforcement is sought").

7. That is not to say, of course, that the Court finds offensive Bank Mandiri's desire to defend. Bank Mandiri is entitled to any and all defenses to an action to enforce a letter of credit, and will remain so entitled in this Court, as this adversary proceeding moves forward. The Court finds offensive only Bank Mandiri's reliance on the notion that it should be relieved of millions of dollars of contractual obligations solely by reason of the absence of a consular notarial flag.

expert affidavits submitted by both sides, it is unclear whether Koplik would be barred from relitigating its claims under Indonesian *res judicata* law. But this Court ultimately need not make or await a finding in this regard. If Indonesian law would allow Koplik merely to cure the procedural defect, there would be no basis for invocation of *res judicata*. And if Indonesian law did not, a rule of law that provided for an escape from major contractual obligations (even those lacking the international sanctity of letters of credit), without regard to the merits of the underlying controversy, would not merit comity in American courts—which value the predictability of contractual relations, and enforce contractual obligations when conditions to enforcement are satisfied.

Thus, to the extent Bank Mandiri bases its motion to dismiss on *res judicata* treatment for the Second Indonesia Supreme Court Decision, Bank Mandiri's motion is denied.

## II.

### Comity

The question as to whether to honor determinations of the Indonesian courts involves another issue as well. The Trustee contends that comity should not be granted to *any* of the Indonesian decisions because of corruption in Indonesian proceedings.

 The decision to grant comity to the determination of a foreign court is a matter within this Court's discretion.[8] "[S]ince comity is an affirmative defense, the [moving party] carrie[s] the burden of proving that comity [is] appropriate."[9] The Second Circuit has declared that "[c]omity will be granted to the decision or judgment of a foreign court if it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated."[10] But Bank Mandiri has not met its burden to satisfy this Court that the Indonesian court system will pass muster under the Second Circuit's standards.

 The Trustee has introduced evidence of two basic types with respect to the alleged corruption in the Indonesian courts: (a) 12 articles, from newspapers and an encyclopedia, describing, with often shocking specifics, manifest corruption in the Indonesia courts,[11] and (b) a report

---

**8.** *See Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 999 (2d Cir.1993) (finding that appellate courts review a trial court's decision to extend or withhold comity under an abuse of discretion standard); *French v. Liebmann (In re French),* 320 B.R. 78, 81 (D.Md.2004) ("As to whether the Bankruptcy Court should have declined to exercise its jurisdiction over the matter based upon the doctrine of international comity, that question was a matter of that court's discretion which this Court reviews under an abuse of discretion standard.").

**9.** *Allstate,* 994 F.2d at 999.

**10.** *Cunard S.S. Co. Ltd. v. Salen Reefer Services AB,* 773 F.2d 452, 457 (2d Cir.1985).

**11.** *See Dallas Morning News,* Feb. 27, 2000 (Friedman Decl. Exh. G) (reporting that an

"unusually fast ruling" from a local judge approving Indonesia's taxation of explicitly tax exempt entity "highlight[ed] Indonesia's weak adherence to rule of law, its checkered judiciary, crumbling central authority and pervasive corruption"; "Corruption here was systemic"; judge offered to give litigant a favorable ruling for $30,000, according to three separate sources);

*The Straits Times (Singapore),* Aug. 26, 2000 (Friedman Decl. Exh. H) ("Almost 80 percent of Supreme Court judges in Indonesia are tainted by bribes, according to the National Law Commission"; two Indonesia Supreme Court judges and a former judge had been declared suspects in a bribery case, though they denied wrongdoing; "Indonesia's justice system has been rated as one of the worst in the world";

from the United States Department of State to the same effect.

With respect to the former, it is initially tempting to conclude that so many articles, all saying the same thing, warrant consideration and considerable reliance. Without a doubt, the articles, if admissible in evidence, would strongly support the Trustee's claims. But if introduced for the truth of the matter asserted (and this Court believes that here they plainly are), the newspaper articles must be excluded from evidence, as hearsay. It is settled law in this Circuit that "[n]ewspaper articles are simply not evidence of anything other than the fact they were published; they are not admissible to prove the truth of the matter asserted therein." [12]

However, the Trustee has put forward evidence in the second category as well, which is not subject to a valid hearsay objection. The Trustee points to a Country Report for Indonesia, issued by the U.S. Department of State for the year 2003 (the "State Department Report"), de-

vice-president of National Law Commission "hope[d] Attorney–General will take more action to clean up the Supreme Court"); *BBC News*, Aug. 30, 2000 (Friedman Decl. Exh. I) ("There are additional doubts over the ability of the Indonesian judicial system to conduct a fully fair trial"; "in six recent corruption cases ... the prosecution lost each time");

*The Jakarta Post*, Jan. 16, 2001 (Friedman Decl. Exh. K) (reporting that no action was taken to combat the corruption; "[law enforcement problems] couldn't be settled because most law enforcement officers still had poor moral integrity"; "[t]hat is what makes it easy for outsiders to interfere with judicial rulings"; "weak internal controls of judges' behavior was also a serious problem"; "improvement should begin with the justices at the [Indonesia] Supreme Court, and then be followed by high court judges and district court judges"; "the corrupted judiciary is one of the most complex problems facing the country");

*The Asian Wall Street Journal*, Dec. 18, 2001 (Friedman Decl. Exh. L) ("Indonesia's justice system has been badly broken for a generation. Not long ago, a senior lawyer in Jakarta claimed that up to 90% of court cases are decided by bribes to judges, prosecutors and other court officials");

*The New York Times*, Jun 21, 2002 (Friedman Decl. Exh. M) ("The decision by an Indonesian court to declare the local subsidiary of a large Canadian life insurance company bankrupt, over the company's objections and despite the fact that it made money [in prior] year [and was asserted to be solvent], ha[d] severely shaken the confidence of foreign investors [in Indonesia], who have grumbled for years about corrup-

tion in the judiciary"; according to foreign executives, "it is increasingly difficult to do business in Indonesia because the courts are often a marketplace where the sizes of bribes decide cases"; "The American ambassador to Indonesia ... said publicly that reform of the courts and the legal system was the most important step Indonesia could take to attract new investment.");

*The Washington Post*, Oct. 29, 2002 (Friedman Decl. Exh. N) ("[in Indonesia courts], bribery is rampant and favoritism the legal standard");

*The Jakarta Post*, Jan. 29, 2003 (Friedman Decl. Exh. O) ("The Indonesian Corruption Watch (ICW) disclosed ... widespread corruption in the country's judicial system, involving a wide range of players, from justices of the Supreme Court to parking attendants at a district court"; "In a civil case at the district court or commercial court, or even in the Supreme Court, the patterns of corruption are similar to those in the legal process of a criminal case"; "And lastly, the Supreme Court must reform itself, [and] recruit clean justices ...");

*The Straits Times (Singapore)*, Sep. 2, 2003 (Friedman Decl. Exh. P) (" 'combating corruption and abuse of legal process in Indonesia' was as vital to its future as fighting terrorism"; "arbitration awards rendered outside Indonesia may be very difficult to enforce in Indonesian courts, especially if the losing party is Indonesian").

12. *Tasini v. New York Times Co., Inc.*, 184 F.Supp.2d 350, 357 (S.D.N.Y.2002) (Carter, J.); *accord Doe v. Karadzic*, No. 93 Civ. 878/1163 (PKL)(HBP), 1997 WL 45515, at *6 (S.D.N.Y. Feb. 4, 1997) (Pitman, J.).

tailing corruption in the Indonesia court system. The State Department Report describes widespread corruption throughout the legal system, aggravated by low salaries paid to Indonesian judges and the pressure those judges face from other governmental authorities.[13] The State Department Report initially noted (as Bank Mandiri argues) that the Indonesian Constitution provides for judicial independence. But within the same sentence the State Department continued: "however, in practice, the judiciary remained subordinate to the executive and was often influenced by the military, business interests, and politicians outside of the legal system."[14] More detailed discussion in the State Department Report was even more damning.[15]

The hearsay impediments to consideration to the newspaper articles do not apply to the State Department Report. In *Bridgeway Corp. v. Citibank*,[16] the Second Circuit addressed this issue squarely. It rejected an argument that a U.S. State Department Country Report, offered for a purpose essentially identical to the one for which the State Department Report has been offered here—to establish that the Liberia's courts were "unlikely to render impartial justice"[17]—was excludible as hearsay.[18] The *Bridgeway* court held, to the contrary, that the U.S. State Department Country Report was admissible under Federal Rule of Evidence 803(8)(C), which allows the admission of "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."[19]

The Second Circuit went on to say:

Rule 803(8) "is based upon the assumption that public officers will perform their duties, that they lack motive to falsify, and that public inspection to which many such records are subject will disclose inaccuracies. 'Factual finding' includes not only what happened, but how it happened, why it happened, and who caused it to happen." The rule therefore renders presumptively admissible "not merely ... factual determinations in the narrow sense, but also ... conclusions or opinions that are based upon a factual investigation."[20]

The Second Circuit then addressed how a court should deal with evidence in the

---

**13.** 2003 Country Reports on Human Rights Practices: Indonesia, Dept. St. Rep., Feb. 25, 2004, at 12–15 (MacGregor Reply Decl. Exh. A).

**14.** *Id.* at 12.

**15.** *See id.* at 13 ("Widespread corruption continued throughout the legal system. During the year, Transparency International reported that the country was among the world's most corrupt, and, in October, the World Bank stated that endemic corruption in the country was compromising law and order. Bribes influenced prosecution, conviction, and sentencing in countless civil and criminal cases.") It went on to say:

In August, the Legal Review Journal investigated the buying of verdicts in corporate civil lawsuits at district courts, high

courts, and the Supreme Court. Based on information obtained from leaked corporate memos and other sources, the Review published a list that estimated the "price of victory" in a court case. Prices ranged from as little as $8,300 at the Bandung District Court to as much as $600,000 at the Supreme Court.
*Id.* at 13.

**16.** 201 F.3d 134 (2d Cir.2000).

**17.** *See id.* at 142.

**18.** *Id.* at 143–44.

**19.** *Id.* at 143. *See* Fed R.Evid. 803(8)(C).

**20.** *Id.* (citations omitted; ellipses in internal quotations in original).

form of factual findings admissible under Fed.R.Evid. 803(8)(C). It held:

> Once a party has shown that a set of factual findings satisfies the minimum requirements of Rule 803(8)(C), the admissibility of such factual findings is presumed. The burden to show "a lack of trustworthiness" then shifts to the party opposing admission.[21]

Here Bank Mandiri did not even try to attack the State Department's findings for lack of trustworthiness. Bank Mandiri's submissions were also notably silent in disputing the presence of the pervasive corruption that the U.S. State Department found. The deficiencies in Bank Mandiri's submissions are relevant first for their failure to show "lack of trustworthiness" (thereby making the State Department Report admissible), and second for their failure to provide contrary evidence that would trump the facts and conclusions set forth in the State Department Report once admitted.

Thus the Second Circuit's determination in *Bridgeway*, on very closely similar facts, makes it plain that the State Department Report is admissible. While this Court necessarily must exclude the newspaper articles, it can and does rely on the State Department Report, prepared by area experts with no apparent axe to grind,[22] which presents a very disturbing picture. The Court also agrees with the Trustee's contentions that the findings of the State Department Report are particularly applicable to the case at bar, as Bank Mandiri is an instrumentality of the Indonesian government—and that the Indonesian courts in proceedings involving Koplik's battle against Bank Mandiri would be especially susceptible to influence from other arms of the government.[23]

Bank Mandiri puts forward some, but very limited, evidence to support its contention that comity should be granted to the Indonesian proceedings. But in that connection, it puts forward none to dispute the accuracy of the U.S. State Department's findings, or otherwise to dispute that corruption in the Indonesian courts is a matter of great concern. Bank Mandiri points out that the district court judges in Jakarta (where Koplik first brought suit against Bank Mandiri and where Kertasindo then brought suit against Koplik and Bank Mandiri) are considered to be some of the most qualified judges in Indonesia. And Bank Mandiri notes that the right to appeal an Indonesian district court's verdict is nearly automatic—assertedly providing an additional measure of confidence with respect to the legitimacy of any pro-

---

**21.** *Id.* (quoting *Ariza v. City of New York*, 139 F.3d 132, 134 (2d Cir.1998)).

**22.** The *Bridgeway* court noted, in this regard: The Reports are submitted annually, and are therefore investigated in a timely manner. They are prepared by area specialists at the State Department. And nothing in the record or in Bridgeway's briefs indicates any motive for misrepresenting the facts concerning Liberia's civil war or its effect on the judicial system there. *Id.* at 143–44. Likewise, Bank Mandiri has provided no basis for questioning the quality of the analysis, or motive, of the State Department here.

**23.** *See* Trustee Sur-reply at 13–15. However, the Court reaches the conclusions it does here under the Second Circuit authority, without reliance on *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 264 F.Supp.2d 490 (S.D.Tex.2003), *aff'd*, 364 F.3d 274 (5th Cir.2004), relied upon by the Trustee. Though the court there did indeed decline to enforce a determination of the Indonesia courts preventing an Indonesian company from paying on an arbitration award, the *Karaha Bodas* court did not need to, and did not, rely on the argument also made there based on corruption in the Indonesian courts. *See id.* at 501 n. 16.

ceeding there. But these matters do not go to the Trustee's real point—that Indonesian judicial proceedings, at all levels, were and are affected by corruption, as practical matter, as to which judges' competence or litigants' theoretical rights to appeal are not determinative.[24]

■ More to the point, Bank Mandiri asserts that comity should be granted because Koplik did not produce any affirmative evidence to show that either of the *specific* Indonesian proceedings was tainted by corruption. But Bank Mandiri's premise is defective in that regard, as Bank Mandiri fails to explain how or why the Indonesia Supreme Court reviewed its own decision, reversing it only at the eleventh hour, and on a basis that had been apparent, if it mattered, from the time of the earliest proceedings in the Indonesia district court. And Bank Mandiri fails to address how decisions on the merits could be reached in the Kertasindo action that were seemingly, if not plainly, contrary to those reached in the First Indonesia Supreme Court decision.

But in any event, evidence of corruption in the specific proceedings was not required in *Bridgeway*, by either Judge Chin or the Second Circuit. There Judge Chin of the district court not only declined to grant summary judgment in favor of the entity seeking to enforce the Liberian

judgment on grounds of comity. He granted summary judgment *the other way,* and was affirmed by the Second Circuit in that regard.[25] The decision of each court was driven, in material part, by the State Department's generalized observations in its country report for Liberia (without addressing the particular dispute between Bridgeway and Citibank) that "corruption and incompetent handling of cases remained a recurrent problem."[26]

Here the State Department Report and the inferences that legitimately can be drawn from it—especially when coupled with the surrounding facts here (e.g., Bank Mandiri's status as an instrumentality of the Indonesian Government; the reversal of the decision in the First Indonesia Supreme Court Decision that Koplik could indeed enforce the Letter of Credit; and the proceedings in Kertasindo Action) are more than sufficient to support a discretionary determination by this Court that it should not grant comity to determinations of a court system of the type the State Department Report described. Especially since it is Bank Mandiri that has the burden of showing that comity should be granted, this Court is not in a position to dismiss this case on motion, and declines to do so.

This Court emphasizes that its decision is *not* based on differences between vari-

---

**24.** Bank Mandiri also relies on a White House press release speaking to a joint statement between the presidents of the United States and Indonesia dealing with efforts to deal with the recent tsunami, to bring peace and stability to the region, and to fight terrorism. *See* Bank Mandiri R. Br. at 6, n. 3. But the press release does not speak to the presence or absence of corruption in the Indonesian judicial system, and the vague comments in the press release as to efforts to "enhance cooperation on various justice-sector issues and related issues of mutual interest" do not address whether proceedings in Indonesia were or are tainted by bribery or other cor-

ruption, and whether corruption in the Indonesian judiciary was cured at the time of the Indonesian judicial proceedings on which Bank Mandiri relies, or, indeed, has been cured as of this day.

**25.** *See Bridgeway Corp. v. Citibank,* 45 F.Supp.2d 276, 287–88 (S.D.N.Y.1999) (Chin, J.), *aff'd,* 201 F.3d 134 (2d Cir.2000).

**26.** *Bridgeway,* 201 F.3d at 138 (quoting the State Department Report). *See also Bridgeway,* 45 F.Supp.2d at 287 (reporting the district court decision).

ous countries' legal systems or their substantive or procedural legal rules. Such are inevitable, and this Court, like others in this Circuit, normally and readily grants comity or assistance to foreign tribunals, even where their procedural practices or substantive law differ materially from our own.[27] But that presupposes that the foreign system, whatever its procedures or substantive law, is fair.[28] As in the Circuit Court decision in *Bridgeway*, this Court does not have to decide whether it would make its comity decision under New York or federal standards. Where, as unfortunately is the case here, the judicial system for which comity is sought has been shown to have systemic corruption, the Court cannot grant that judicial system's determinations comity under either state or federal law. As the Second Circuit held in *Bridgeway*, citing its earlier decision in *Ackermann v. Levine*,[29] under both New York statute and under the common law standard, "judgments rendered by a judicial system that fails to be impartial or to conform its procedures to due process are not enforceable."[30] Thus this Court is not in a position to dismiss this action based on deference to the Second Indonesia Su-

preme Court decision, or the Kertasindo decision, and will not do so.[31]

At the least, Bank Mandiri is not entitled to dismissal on motion on comity grounds. The decisions by Judge Chin and the Second Circuit in *Bridgeway*[32] could be argued to suggest that this Court should rule more broadly—that like Judge Chin, this Court should not just decline relief on motion to the party invoking comity, but should reject the application of comity in the case for all time. But this Court does not need now to decide whether Bank Mandiri deserves another opportunity to relitigate the comity issues it has raised here. It is sufficient, for purposes of this determination, for the Court to say that Bank Mandiri plainly has not established a basis for dismissal on comity grounds on motion. Each side can have a reservation of rights with respect to further matters down the road.

### III.

### Collateral and Judicial Estoppel

Bank Mandiri also argues that the Trustee is collaterally estopped from arguing that the Letter of Credit is valid and enforceable against Bank Mandiri because

**27.** *See, e.g., In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1050 (2d Cir.1996) (approving, as a matter of international comity, deference to laws of England regarding voidable preferences in American chapter 11 case conducted in coordination with English proceeding, even though English law, unlike U.S. law, would require transferor to act with specific intent); *In re Ephedra Products Liab. Litig.*, 349 B.R. 333, 335–37 (S.D.N.Y.2006) (Rakoff, J.) (granting comity to Canadian mass tort claims resolution procedure, even though it did not grant a right to a jury trial).

**28.** *See, e.g., In re PSINet Inc.*, 268 B.R. 358 (Bankr.S.D.N.Y.2001) (Gerber, J.) ("[T]his Court takes obligations of comity seriously, particularly where, as here, the two legal systems involved, those of the United States and Canada, share common commercial values

and *values of fairness and due process.*") (emphasis added).

**29.** 788 F.2d 830, 842 n. 12 (2d Cir.1986).

**30.** *Bridgeway*, 201 F.3d at 141 n. 1.

**31.** Nor will this Court stay this action to await developments in Indonesia, for the same reasons.

**32.** Judge Chin did not just deny a motion for summary judgment premised on the existence of comity. He granted summary judgment the other way—rejecting, as a matter of law, comity as a defense. The Second Circuit affirmed his ruling in all respects. *Bridgeway*, 45 F.Supp.2d at 287–88, *aff'd, Bridgeway*, 201 F.3d 134.

this issue was reached by the Surabaya District Court in the Kertasindo Decision, and that the Trustee is judicially estopped from proceeding here because Koplik participated in litigation involving these and closely related issues in Indonesia. The Court disagrees.

■ Collateral estoppel is not a bar to the Trustee for two separate reasons. First, the Kertasindo decision was provisional and is the subject of a pending appeal, and each, by itself, bars collateral estoppel from being invoked. Second, and more fundamentally, this Court has determined, in Part II above, that the Kertasindo Decision is not entitled to comity. For this reason too, this Court cannot, and will not, apply collateral estoppel to any Kertasindo findings.

■ Similarly, the Court must reject Bank Mandiri's contention that the Trustee is judicially estopped from suing here by reason of Koplik's litigation in Indonesia. A similar argument was made, and rejected, in *Bridgeway*. The Second Circuit there noted that "[j]udicial estoppel 'prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [the party] in a prior legal proceeding.'"[33] It continued:

> "[a] party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner." We have described the type of inconsistency required as a "clear inconsistency between [the party's] present and former positions."[34]

And it went on to say that:

> Defending a suit where one has been haled into court, and suing where jurisdiction and venue readily exist do not constitute assertions that the relevant courts are fair and impartial. Accordingly, we do not view Citibank's voluntary participation in Liberian litigation, *even as a plaintiff,* as *clearly contradictory* to its present position.[35]

Judge Chin, in his own analysis (which this Court believes was fully approved by the Second Circuit in the relevant part of its decision affirming him) held to the same effect, albeit somewhat more extensively. He expressly rejected a contention very similar to that here—that judicial estoppel should be invoked because Citibank voluntarily appeared in litigation in Liberia without then contending that the Liberian system of jurisprudence was defective in any way. In the absence of a showing that the litigant ever actually took a position that proceedings in the foreign court were impartial, Judge Chin found invocation of judicial estoppel unwarranted. He held, *inter alia:*

> Bridgeway has not demonstrated that the requirements of judicial estoppel have been met. Citibank never took the position in the Liberian proceedings that the Liberian courts are impartial and that the Liberian judicial system operates in accordance with the basic requirements of due process. That Citibank chose to defend itself in Liberia when sued surely does not mean that it waived any and all objections it might

---

**33.** 201 F.3d at 141 (quoting *Bates v. Long Island R.R.,* 997 F.2d 1028, 1037 (2d Cir. 1993)).

**34.** *Id.* (quoting *Mitchell v. Washingtonville Cent. Scho. Dist.,* 190 F.3d 1, 6 (2d Cir.1999)

and *Maharaj v. Bankamerica Corp.,* 128 F.3d 94, 98 (2d Cir.1997)).

**35.** *Id.* (first emphasis added).

have to the fairness of the Liberian judicial system. Hence, Citibank cannot be said to have taken a position in a prior proceeding that is inconsistent with its position here.[36]

Finally, each of Judge Chin and the Second Circuit reached the conclusions they did even though the party opposing comity had appeared not just as a defendant, but *also as a plaintiff.*[37]

As in *Bridgeway,* Bank Mandiri's judicial estoppel contention is rejected.

## IV.

### *Reservation of Postconfirmation Claims in the Plan*

Bank Mandiri also argues that the Trustee's claims should be dismissed because Koplik's Plan did not specifically provide for the Court's retention of jurisdiction over this proceeding under section 1123(b)(3)(B) of the Code.[38] Koplik's Plan had expressly reserved the Court's jurisdiction over postconfirmation claims, but did not specifically identify the Trustee's current claims against Bank Mandiri.[39]

Courts differ on how specific the language of retention and enforcement must be under section 1123(b)(3)(B).[40] Despite this conflict among the courts, it has been held in this Court, as affirmed by the district court and the Second Circuit, that a debtor's plan of reorganization may reserve postconfirmation claims in general terms.[41] In *I. Appel,* the district court, and subsequently the Second Circuit, found a chapter 11 debtor's general reservation of rights to litigate postconfirmation claims to be satisfactory, and rejected the notion that specific causes of action had to be preserved in a plan of reorganization.[42] The *I. Appel* court found persuasive the *Ampace* line of cases, which rejected the requirement of the specificity of claims in the plan of reorganization.[43]

In this case, Koplik's Plan expressly reserved this Court's jurisdiction over postconfirmation claims, but did not specifically identify and reference the Trustee's current claims against Bank

---

**36.** *Bridgeway,* 45 F.Supp.2d at 283–84.

**37.** *See id.* at 283; *Bridgeway,* 201 F.3d at 141.

**38.** Bankruptcy Code section 1123(b)(3)(B) provides, in part, that "[A] plan may provide for the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest."

**39.** *See* Koplik's Plan of Reorganization, Article XI, § 11.03 ("Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Litigation Trustee shall retain and may enforce any and all claims of the Debtor or the Estate, including, but not limited to, claims against governmental units.").

**40.** *See In re Ampace Corp.,* 279 B.R. 145, 157 (Bankr.D.Del.2002) ("The courts are divided on how specific the language of retention and enforcement must be under § 1123(b)(3)(B) to adequately reserve a cause of action for

adjudication at a later date."); *In re Goodman Bros. Steel Drum Co., Inc.,* 247 B.R. 604, 607 (Bankr.E.D.N.Y.2000) ("Case law is divided on how specific language of retention and enforcement must be under [section] 1123(b)(3)(B).").

**41.** *See In re I. Appel Corp.,* 300 B.R. 564, 569 (S.D.N.Y.2003) (Marrero, J.) ("It is neither reasonable nor practical to expect a debtor to identify in its plan of reorganization or disclosure schedules every outstanding claim it intends to pursue with the degree of specificity that the [defendants] would require.").

**42.** *See id.*

**43.** *Id.* at 568–69. *See, e.g., Ampace,* 279 B.R. at 158 ("[T]here is nothing in [section 1123(b)(3)(B) ] to suggest that the plan must specifically identify each and every claim and/or interest belonging to the debtor that may be subject to retention and enforcement.").

Mandiri. Rather, like the plans in *I. Appel* and *Ampace*, Koplik's Plan contained a general statement on the court's retention of jurisdiction. It stated that:

> The Bankruptcy Court shall retain and have exclusive jurisdiction over all matters arising out of or relating to the Chapter 11 Case, including, without limitation ... all claims (including claims arising in common law or in equity) against any Entity on account of any debt or other claim owed to or in the favor [of] the Debtor or its Estate.[44]

This reservation plainly reflected an intent to retain the right to bring postconfirmation claims on debts adjudicated in this Court. Additionally, as discussed in *Ampace*, the plain language of section 1123(b)(3)(B) does not require a plan to specify every claim; rather, section 1123(b)(3)(B) provides that the plan *may* do so.[45] The Court thus concludes that Koplik's Plan satisfactorily reserved this Court's retention of jurisdiction in this proceeding.

 Bank Mandiri also makes another, different, judicial estoppel argument. It argues that judicial estoppel bars the Trustee from bringing his claims due to the non-disclosure of such claims in the Plan. Some bankruptcy courts have invoked judicial estoppel in order to prevent a debtor who has failed to disclose a claim *for his own benefit* from subsequently asserting that claim *after* emerging from bankruptcy.[46] As a party invoking judicial estoppel, Bank Mandiri must show that (1) the Trustee or Koplik "advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner."[47]

But Bank Mandiri did not show, or even allege, any facts that (1) the Trustee or Koplik "advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner." Rather, Bank Mandiri's showing boils down to an assertion that "[g]iven the lack of any mention of a potential claim against Bank Mandiri prior to the institution of this lawsuit, the claims against Bank Mandiri are barred as a matter of law and should be dismissed."[48] As Bank Mandiri has

---

44. *See* Koplik's Plan of Reorganization, Article XIV, § 14.02(*l*).

45. *See Ampace*, 279 B.R. at 158.

46. *See Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G., New York Branch (In re Galerie Des Monnaies of Geneva, Ltd.)*, 62 B.R. 224, 225 (S.D.N.Y.1986) ("The bankruptcy court properly dismissed [the debtor's] attempt to recover preferential transfers after the debtor had previously told creditors voting on the reorganization plan that it knew of no such transfers."). *See also Rosenshein v. Kleban*, 918 F.Supp. 98, 104–05 (S.D.N.Y. 1996) ("The bankruptcy court approved [the plaintiffs'] plans of reorganization and discharged their debts on the basis of their incomplete disclosure of assets, thereby adopting their position. [The plaintiffs] now seek to assert the contrary position that they have claims against [the defendants]. This is precisely the sort of 'about-face' that undermines the integrity of the bankruptcy process. Therefore, the doctrine of judicial estoppel provides an alternative basis on which to grant summary judgment dismissing [the plaintiffs'] claims.").

47. *Wight v. BankAmerica Corp.*, 219 F.3d 79, 90 (2d Cir.2000) (quoting *AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 628 (2d Cir.1996)). *See also Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72 (2d Cir.1997) ("By adopting a rule that requires acceptance by the earlier tribunal of the litigant's statements, this court limits the doctrine of judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain.").

48. Mot. to Dismiss at 13. Similarly, in its Reply Memorandum, Bank Mandiri simply states that "[t]he Trustee has not shown any reason, legal or otherwise, why he should be

satisfied neither requirement, judicial estoppel does not bar the Trustee's claims.

## V.

### FSIA Requirements

 Finally, Bank Mandiri asserts that this Court does not have personal jurisdiction over Bank Mandiri due to the Trustee's improper service. Bank Mandiri maintains, and the Trustee does not dispute, that the FSIA applies because Bank Mandiri is an instrumentality of Indonesia.[49] Bank Mandiri argues that this action should be dismissed because the Trustee assertedly failed to serve process in accordance with FSIA's requirements.

As an instrumentality of a foreign state, Bank Mandiri had to be served pursuant to one of the three methods under FSIA section 1608(b). Section 1608(b)(3) provides, in relevant part:

(b) Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:

. . .

(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, *together with a translation of each into the official language of the foreign state*—

(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

(C) as directed by order of the court consistent with the law of the place where service is to be made.[50]

The Trustee admittedly did not comply with the service requirements of section 1608(b)(3) when he first served the summons and Amended Complaint on Bank Mandiri without a copy translated into Bahasa, the official language of Indonesia. However, this service defect did not preju-

---

allowed to abuse the process by pursuing claims that were never disclosed in this case and has [*sic.*] already been litigated." Reply Mem. at 25–26.

**49.** The FSIA defines an "agency or instrumentality of a foreign state" as a separate legal entity (corporate or otherwise), owned in the majority by a foreign state, that is neither a citizen of a U.S. state nor a creation of a foreign state. 28 U.S.C. § 1603(b)(1)-(3). According to an affidavit provided on its behalf, Bank Mandiri is a separate legal entity that is 70% owned by the Indonesian Government, and is neither a citizen of a U.S. state nor the creation of a third country's laws. *See* Supp. Sardjono Decl. ¶2 (being the merged bank of four other state-owned Indonesian banks, Bank Mandiri appears to be a separate legal entity in the way a bank in the United States would be); Supp. Sardjono Decl. ¶3 (relying on information about stock ownership). Therefore, Bank Mandiri meets

the requirements of 28 U.S.C. § 1603(b), and is an "agency or instrumentality of a foreign state."

Understandably, Bank Mandiri does not contend that it is immune from jurisdiction here. The FSIA also provides that a foreign sovereign is not immune from U.S. jurisdiction when the case is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Issuing a letter of credit, as Bank Mandiri did, plainly is commercial activity. And since a New York branch of Bank Mandiri was the issuing bank on the Letter of Credit and Koplik is an American corporation, Bank Mandiri's refusal to pay on the Letter of Credit had a direct effect in the United States.

**50.** 28 U.S.C. § 1608(b)(3).

dice Bank Mandiri, because Bank Mandiri clearly received actual notice of the Amended Complaint as demonstrated by the prompt filing of its Motion to Dismiss. Also, it appears to be undisputed that a certified translation of the summons and Amended Complaint was subsequently sent to Bank Mandiri on June 8, 2005, approximately 35 days after the Amended Complaint was filed.[51]

Federal courts in New York have permitted plaintiffs to litigate claims even where service was defective under section 1608(b)(3), as long as the plaintiff cures the service defects and the defendant is not prejudiced.[52] For example, in *Lippus*, the plaintiff failed to serve a translated copy of the summons and complaint to the defendant, an instrumentality of Germany, in violation of the translation requirement under section 1608(b)(3).[53] However, the court found that there was little to no

prejudice to the defendant since the defendant had actual notice of the complaint and the service defects were easily correctable.[54] As a result, the *Lippus* Court denied the defendant's motion to dismiss due to insufficiency of process, and ordered the plaintiff to mail translated copies of the summons and complaint to the defendant within 30 days.[55]

Additionally, other federal courts, including several in this district, have determined that strict compliance with section 1608(b)(3) is not mandatory, and that substantial compliance suffices to satisfy the service requirements.[56] Plaintiffs are found to have substantially complied with section 1608(b)(3), even if translated copies of the summons and complaint were not provided to the defendant, where the defendant had actual knowledge of the summons and complaint and was not prejudiced.[57] The interest in allowing sub-

**51.** See Friedman Decl. ¶ 6, Ex. D and E; MacGregor Reply Decl. ¶¶ 5–7.

**52.** *See Daly v. Castro Llanes*, 30 F.Supp.2d 407, 416–417 (S.D.N.Y.1998) (Schwartz, J.) (affording plaintiff additional time to cure defect of service under section 1608(b)(3) where defendant had actual notice of the lawsuit); *Lippus v. Dahlgren Mfg. Co.*, 644 F.Supp. 1473, 1479 (E.D.N.Y.1986) (Wexler, J.) (same).

**53.** *Lippus*, 644 F.Supp. at 1477.

**54.** *Id.* at 1479.

**55.** *See id.* ("Although the Court cannot understand why plaintiffs never complied with the plain language of [28 U.S.C. § 1608(b)(3)], allowing them to perfect service at this time ensures compliance with the words and spirit of the FSIA and allows the lawsuit to go forward. It is uncontested that [the defendant has] long had actual notice of the lawsuit.... Furthermore, service defects appear readily curable and ... there is little tangible prejudice to [the defendant]."). *See also Daly*, 30 F.Supp.2d at 416–17 (allowing plaintiff 30 days to effect proper service of process on the defendant with translated cop-

ies of summons and complaint, as required under § 1608(b)(3)).

**56.** *See, e.g., Sherer v. Construcciones Aeronauticas, S.A.*, 987 F.2d 1246, 1250 (6th Cir.1993) (allowing case to go forward on the merits where actual notice was received, despite the lack of strict compliance with the FSIA); *Sakhrani v. Takhi*, No. 96–CV–2900, 1997 WL 33477654, at *6–*7 (S.D.N.Y. Sept.10, 1997) (Ellis, J.) (discussing the substantial compliance test); *Finamar Investors Inc. v. The Republic of Tadjikistan*, 889 F.Supp. 114, 117–18 (S.D.N.Y.1995) (Mukasey, C.J.) (same); *Banco Metropolitano, S.A. v. Desarrollo de Autopistas y Carreteras de Guatemala, S.A.*, 616 F.Supp. 301, 304 (S.D.N.Y.1985) (Sweet, J.) (same).

**57.** *Banco Metropolitano*, 616 F.Supp. at 304 ("In view of service on the consulate in New York, and in view of the receipt of actual knowledge of the summons and complaint in Guatemala, albeit not in a Spanish version, and without mailing by the clerk of the court, substantial compliance has been achieved...."). *See also Sakhrani*, 1997 WL 33477654, at *7 (finding that plaintiff did not substantially comply with section 1608(b)(3)

stantial compliance with section 1608(b)(3) is that "a technical defect in service should not override the fact that the defendant received actual notice." [58]

The case at hand is similar to those cited above in many respects. The Trustee failed to comply with the service requirements of section 1608(b)(3) when he failed to serve Bank Mandiri with copies of the summons and Amended Complaint translated into Bahasa. But the Court finds that the Trustee substantially complied with section 1608(b)(3), and cured the initial defect by quickly re-serving Bank Mandiri with translated copies. Bank Mandiri was not prejudiced because it had actual notice and knowledge of the Amended Complaint—as evidenced, *inter alia*, by the fact that Bank Mandiri timely filed an extensive motion to dismiss. And the lawyers at Bank Mandiri's U.S. counsel, one of the most prestigious law firms in the United States, speak and understand English very well.

The Court concludes that the Trustee's failure to serve translated copies to Bank Mandiri is not a basis for dismissing this proceeding, as Bank Mandiri had actual notice and the Trustee subsequently effected proper service.

### Conclusion

For the foregoing reasons, Bank Mandiri's Motion to Dismiss is denied in its entirety.

SO ORDERED.

---

because plaintiff did not demonstrate that defendant had actual knowledge of summons and complaint); *Finamar Investors,* 889 F.Supp. at 117 (noting that "[s]everal courts have upheld service where the serving party

'substantially complied' with the requirements of the FSIA if actual notice was received....").

**58.** *Sherer,* 987 F.2d at 1249.